UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY L. SLAUGHTER,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MATTHEW CATE, et al.,<br><br>　　　　Defendants. | Case No. 12-cv-03872-VC<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 28 |

　　　　Plaintiff Terry L. Slaughter, a state inmate, filed this *pro se* civil rights complaint under 42 U.S.C. § 1983 alleging that Mathew Cate, the former Secretary of the California Department of Corrections and Rehabilitation, and Gary Swarthout, the former warden at Slaughter's former prison, violated Slaughter's due process rights by refusing to verify and expunge allegedly false information in Slaughter's central prison file. On November 22, 2013, this Court granted, in part, the defendants' motion to dismiss, ruling that Slaughter's due process claim based on events that occurred in 2002 was time-barred and his claim based on events that occurred in 2010 could go forward. The latter claim is the only one remaining in this case. *See* Doc. No. 23 at 12. For the reasons explained below, the defendants' motion for summary judgment is granted.

## BACKGROUND

　　　　Slaughter is serving a fourteen-year determinant sentence for his conviction of multiple counts, including robbery, forcible rape and oral copulation, committed in concert and with a firearm. Declaration of S. Pangelinan in Support Mot. Summ. J. (Pangelinan Decl.) ¶ 10, Ex. B. He is also serving a consecutive twenty-five-year-to-life indeterminate sentence for his conviction of first-degree murder. *Id*. ¶ 11, Ex. C.

　　　　Slaughter argues that the probation report used at his sentencing hearing in 1987 contained the following inaccurate information: (1) Slaughter escaped from the California Youth Authority in 1974; (2) Slaughter committed murder by "sneaking up on the victim" and shooting him in the

back of the head, execution style; and (3) Slaughter committed rape with a foreign object. Slaughter alleges that his central prison file includes the allegedly false facts that are in the probation report. He further contends that the defendants are improperly using this information to assign him to higher security prisons where he does not have the opportunity to participate in vocational and other prison programs. And he argues that his inability to participate in these programs will lead the Parole Board to find him unsuitable for parole. Slaughter seeks an order requiring the defendants to expunge the allegedly false information from his prison file and enjoining them from using the false information in any further prison proceedings. Slaughter contends that he has provided the prison with letters from the probation department that indicate the alleged inaccurate information is not in his probation report. He alleges that, although the prison has placed the probation department letters in his central file, the defendants have not expunged or corrected the information in his central file.

The Department of Corrections maintains a master file for each inmate, known as the inmate's central file or "c-file." Pangelinan Decl. ¶ 3. The inmate's central file contains all information received from courts, probation departments and law enforcement agencies, in addition to documents concerning the inmate's prison history. *Id.* Case-records staff conducts periodic audits of an inmate's legal file to ensure accuracy. *Id.* ¶ 6. During an audit, case-records staff conducts a computation review, including checking that the inmate's current parole and release dates are correct, that the conviction records correctly identify the inmate and that all sentencing dates and credits have been included in the audit. *Id.* Staff does not review the specific factual details regarding the underlying crime or evidence relating to sentencing factors. *Id.* The Department of Corrections is not responsible for creating an inmate's probation report or for handling an inmate's disputes with local probation authorities regarding the content of a probation report. *Id.*

If an inmate believes his central file contains errors that the Department is relying on to calculate his sentence, he may request a computation review hearing, also known as a "Haygood"

hearing.[1]  *Id.* ¶ 8.  At this hearing, the inmate may inspect the legal portion of his file and discuss any concerns with a correctional case specialist.  *Id.*

On February 8, 2010, Dr. Rola Oyeyemi, forensic psychologist for the Board of Parole Hearings ("Parole Board"), Forensic Assessment Division, completed a comprehensive risk assessment report regarding Slaughter's potential for violence if paroled into the community.  *Id.* ¶ 12, Ex. D.  The report summarized Slaughter's psychosocial background and criminal history, and made clinical findings based on a psychological evaluation.  *Id.*  In a memorandum dated April 3, 2010, Slaughter submitted a written rebuttal to this report, arguing that it contained factual errors regarding the details of his underlying convictions and criminal history.  *Id.*, Ex. E. Slaughter requested that the February 8, 2010 report be retracted and removed from his c-file.  *Id.* He also requested that a new risk assessment be undertaken by the Forensic Assessment Department.  *Id.*  On June 21, 2010, in response to Slaughter's memorandum, Dr. Cliff Kusaj, Chief Psychologist of the Board's Forensic Assessment Division, completed a secondary review of the comprehensive risk assessment to address any potential errors and determine whether an updated psychological evaluation or addendum was necessary.  *Id.*, Ex. F at 1.  Dr. Kusaj concluded, "Dr. Oyeyemi clearly documented the factual bases for her clinical opinions regarding Mr. Slaughter's mental status and his risk for violence recidivism.  Mr. Slaughter's objections are not suggestive of administrative or substantive error on the part of Dr. Oyeyemi.  The panel is encouraged to consider Dr. Oyeyemi's evaluation findings relative to other evidence presented at Mr. Slaughter's initial suitability hearing."  *Id.* at 3.

On October 19, 2010, Slaughter submitted an inmate grievance alleging that officials at his former prison were failing to correct false information in his central file that was taken from a probation report and that this false information was being used to calculate his release and parole dates.  *Id.*, Ex. G.  Slaughter requested an interview, a Haygood hearing, and a copy of his probation report.  *Id.* at 3.  The disposition of Slaughter's grievance at the Second Level of review stated the following:

---

[1] The record does not indicate when an inmate can request a Haygood hearing.  From Pangilinan's declaration, it appears that an inmate can request such a hearing at any time.

> Appellant was interviewed on December 15, 2010, at 1115 hours to provide him the opportunity to fully explain his appeal issue. His time computation was explained to him by Case Records supervisory staff. Appellant received a determinate term of 14 years and a life term of 25 years for a total of 39 years to life. Per the Board of Parole Hearings (BPH) administrative process, appellant is eligible for his Initial Parole Consideration Hearing 13 months prior to his [Minimum Eligible Parole Date] MEPD, which in this case, was September 2009. Appellant requested postponement for one year which was approved by the BPH, and appellant's Initial Hearing will be scheduled for the next available date.
>
> During the interview, appellant was given a copy of his [probation report] POR and he was satisfied with its correctness. Appellant's MEPD keeps changing due to several CD 115 Rules Violation Reports he received with behavioral credit losses. Since the MEPD determines the date of the Initial Hearing, this date keeps changing as well, if appellant continues to receive serious level disciplinary reports, until his Initial Hearing is held.

*Id.*, Ex. G. at 6.

Slaughter was dissatisfied with the Second Level disposition because the probation report "continues to contain false and incorrect information which the prison refuse [sic] to verify or ascertain its truth. For example, I was not charged or convicted for 'Rape with a Foreign Object'! Second, I never escaped from Youth Authority." *Id.* at 4.

The written disposition of Slaughter's grievance at the Director's Level of review found that the examiner at the Second Level had "reviewed the submitted documentation and determined that [the prison] is enforcing the rules and regulations as required by departmental and institutional policy. . . . no evidence has been presented to support the appellant's position." *Id.* at 1. The reviewer also noted that Slaughter's probation report was prepared by the county of his commitment and recommended that Slaughter contact the Los Angeles County Probation Department if he had concerns about the accuracy of the information in the probation report. *Id.*

Slaughter's initial parole hearing was held on May 22, 2012. *Id.*, Ex. H. The Parole Board denied Slaughter parole for seven years on the ground that he posed an unreasonable risk of danger to public safety if he were released into the community. *Id.* at 112. The Parole Board's decision included a discussion of the factors it had considered in denying parole, noted that Slaughter had the opportunity to be heard and that his comments, including his claims regarding errors in the comprehensive risk assessment, had been addressed. *Id.* at 100-15.

Pangilinan asserts that, based on his review of Slaughter's probation reports and most recent sentencing computation, the specific factual details contained in the probation report had no impact on the calculation of Slaughter's earliest possible release date. *Id.* at ¶ 17. This is disputed by Slaughter, who states that the prison has failed to correct the false information in his record and this false information "affects his rehabilitation efforts and restricts his opportunity to become eligible and suitable for parole" because it improperly is used to assign him to prisons and to restrict him from engaging in programs and vocational opportunities that would permit him to demonstrate that he is suitable for parole. Opp. at 7. Slaughter also submits two letters he received from the Los Angeles County Probation Department in 2002 in response to his inquiries regarding information in his probation report that he believed to be inaccurate. Opp., Ex. D at 5, 6. The letters state that the probation department conducted an investigation into his concerns and found that the probation report did not refer to any of the issues he had mentioned, including an alleged escape from the California Youth Authority. *Id.* Slaughter also submits the first level response to his 2003 appeal indicating that the two letters from the Los Angeles County Probation Department had been placed in his central file. *Id.*, Ex. A at 2.

## LEGAL STANDARD

Summary judgment is only proper where the pleadings, discovery, and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.*

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions,

answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

In considering a motion for summary judgment, the court must review the evidence in the light most favorable to the nonmoving party. *Leslie v. Grupo ICA,* 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir. 1987).

## DISCUSSION

The defendants argue that they are entitled to summary judgment on the following grounds: (1) Slaughter has no liberty interest in the accuracy of his central file in this particular context; (2) if Slaughter had such a liberty interest, he received all the process he was due; (3) Swarthout and Cate were not personally involved in any alleged due process violation; and (4) Slaughter's central file does not contain false information. Because the defendants' first argument is dispositive, the Court does not address their latter arguments.

**I. Due Process Legal Standard**

The Supreme Court has held that the due process rights of a convicted prisoner are limited to (1) freedom from restraint which "exceed(s) the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," or (2) those liberty interests created by state law or regulation. *Sandin v. Connor*, 515 U.S. 472, 484 (1995). Where the deprivation lies within the limits of custody authorized by the conviction, no liberty interest is protected by the Due Process Clause itself. *Jones v. Moran*, 900 F. Supp. 1267, 1271 (N.D. Cal. 1995) (citing *Wolff v. McDonnell*, 481 U.S. 539, 557 (1974) and *Meachum v. Fano*, 427 U.S. 215, 225 (1976)). However, a state statute or regulation can still create a right triggering due process protection. *Id.*

Before *Sandin*, whether a state statute or regulation created a liberty interest was determined by examining the statute or regulation to determine if it used "language of unmistakably mandatory character," to provide that the liberty would not be infringed unless specified substantive predicates were met. *Id.* (citing *Hewitt v. Helms*, 459 U.S. 460, 471-72

(1983)). In *Sandin*, the Court adopted a new test shifting the emphasis away from the language of the statute or regulation purportedly creating the liberty interest to consideration of the nature and significance of the purported liberty interest itself. *Id.* at 1272. Under *Sandin*, the state liberty interest in question must be one of "real substance." *Sandin*, 515 U.S. at 477-87. "Real substance" means freedom from (1) restraint that imposes "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," *id.* at 484, or (2) state action that "will inevitably affect the duration of [a] sentence," *id.* at 487. After *Sandin*, the language of state statutes and regulations play little, if any, role in determining the existence of a protected, state-created liberty interest. *See Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005) ("the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of the regulations regarding those conditions but the nature of those conditions 'in relation to the ordinary incidents of prison life.'").

Thus, a court presented with a procedural due process claim by a prisoner must first ask whether the alleged deprivation is one so severe that it implicates the Due Process Clause itself or one less severe that implicates an interest created by state statue or regulation that involves a deprivation of "real substance." If the alleged deprivation implicates neither, no procedural due process claim is stated.

**II. Analysis**

Slaughter argues that *Paine v. Baker*, 595 F.2d 197 (4th Cir. 1979) establishes that the Due Process Clause creates a liberty interest in the accuracy of his prison file. *Paine* held that the United States Constitution created a liberty interest in having false information expunged from an inmate's prison file. 595 F.2d at 201-02. However, as pointed out in *Ricchio v. Eichenberger*, *Paine* was decided before the Supreme Court issued its opinion in *Greenholz v. Inmates of Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1979). *Ricchio*, 2011 U.S. Dist. LEXIS 1079, at *4. *Greenholz* held that the Constitution does not create a liberty interest in parole. 442 U.S. at 7. After *Greenholz*, although *Paine* was not explicitly overruled, subsequent cases held that, if a prisoner does not have a constitutional liberty interest in parole, there cannot be a liberty interest in the procedures relating to the grant of parole, including the maintenance of accurate

1  prison files. *See Ricchio*, U.S. Dist. LEXIS 1079, *5-6 (listing cases); *see also Johnson v.*
2  *Rodriguez*, 110 F.3d 299, 309 n.13 (5th Cir. 1997) (cases decided after *Paine* undercut any
3  contention that its analysis is still viable.).  Furthermore, the Supreme Court has held that the
4  inaccuracy of records compiled or maintained by the government is not, standing alone, sufficient
5  to state a claim under the Due Process Clause.  *See Paul v. Davis*, 424 U.S. 693- 711-14 (1976).
6  Therefore, the Due Process Clause does not automatically protect the accuracy of Slaughter's
7  prison file.

8        Nor does Slaughter show that the allegedly false information would affect the duration of
9  his sentence or impose an atypical and significant hardship on him in relation to the ordinary
10 incidents of prison life.  *Sandin*, 515 U.S. at 484, 487; *see also Ricchio*, 2011 U.S. Dist. LEXIS
11 1079, at *7-8 (after *Sandin*, inmates seeking to expunge erroneous information from c-file must
12 show false information will inevitably lengthen duration of their incarceration); *Noble v. Evans*,
13 2010 U.S. Dist. LEXIS 26721, *21-23 (E.D. Cal. 2011) (same).  Slaughter merely asserts that the
14 allegedly false information was used "to adjust [his] custody classification, housing and work
15 status," and these collateral consequences impeded "his eligibility for parole and ultimately his
16 suitability for parole."  Opp. at 5-6.  Slaughter's concern about future parole hearings based on
17 "collateral consequences" is speculative and cannot support a liberty interest.  *See Sandin*, 515
18 U.S. at 487 (claim that false misconduct charge might affect possibility of parole is "too attenuated
19 to invoke procedural guarantees of Due Process Clause").  Likewise, collateral consequences such
20 as Slaughter's classification, housing and work status cannot form the basis of a due process claim
21 because they do not constitute the type of atypical and significant hardship required for a
22 deprivation to be of "real substance."  *See Meachum v. Fano*, 427 U.S. 215, 228 n.8 (1976)
23 (inmate's interest in classification and privilege status is not one of "real substance"); *Myron v.*
24 *Terhune*, 476 F.3d 716, 718 (9th Cir. 2007) (no due process claim in inmate's classification at
25 Level IV rather than Level III because no showing it caused atypical and significant hardship or
26 affected duration of his sentence).

27       Slaughter cites *Noble v. Evans* to support his argument that false information in an
28 inmate's file can rise to the level of a due process violation where adverse administrative decisions

are based upon it.  However, *Noble* found the allegedly false information in the inmate's file did not constitute a due process violation.  2010 U.S. Dist. LEXIS 26721, at *22.  The court explained that the allegedly false information that the inmate had been charged with oral copulation with a child under 14 would not inevitably lengthen the duration of the inmate's sentence.  *Id.*  This is because the Parole Board's decision as to whether a prisoner is suitable for parole "rests on a myriad of considerations" and the inmate would "'be afforded procedural protections at his parole hearing in order to explain the circumstances' behind any disputed information." *Id.* (citing *Sandin*, 515 at 487).  This analysis applies to Slaughter's situation.

Given that Slaughter does not have a liberty interest in the verification or expungement of allegedly false information in his prison file, his due process claim fails.  Summary judgment is granted in favor of the defendants.

## CONCLUSION

Based on the foregoing, the Court orders as follows:

1. The defendants' motion for summary judgment is granted.  Doc. no. 28.

2. The Clerk of the Court shall enter a separate judgment and close the file.

**IT IS SO ORDERED.**

Dated: October 28, 2014

_____
VINCE CHHABRIA
United States District Judge